## MABRY AND WIFE v. CHURCHWELL, et als.

1. BILL. *Dismissal. Not res judicata unless upon its merits.* The dismissal of a bill cannot be relied on as *res judicata* unless the bill was dismissed upon its merits.

2. DECREE. *Void. Imbecility of parties.* A decree of sale by the Chancery Court will be set aside as void, upon a bill filed for that purpose, where it appears that the defendant was of weak mind, incapable of transacting business, and unable to guard himself against the importunity or undue influence of complainant. The case of *Craddock* v. *Cabiness*, 1 Swan, 474, cited and approbated.

### FROM KNOX.

Appeal from the Chancery Court at Knoxville. ―――― ―――――, Sp. Ch.

WASHINGTON, CROZIER, REEVE, CALDWELL, TRIGG, and TEMPLE for complainants.

WASHBURN, HENDERSON & BAXTER for defendants.

FREEMAN, J., delivered the opinion of the court.

The original and amended bills in this case may be briefly summarized by saying they are intended to obtain relief by having certain purchases of property, real and personal, made under proceedings in the Chancery Court at Knoxville, declared void, and have the same set aside on the ground that George W. Churchwell, whose property was thus sold, was of unsound mind, and incompetent to transact business at the time said proceedings were instituted and decrees made. In fact, the charge is made in the original as well as an amended bill, that he was insane, and

therefore the proceedings were null and void. Whether he was of competent understanding to be bound by his acts under the circumstances, is the question on which the case turns. The bill is filed by Mabry as administrator of said Churchwell, and by Mabry and wife, the wife being a daughter and distributee and heir of said Churchwell. Mrs. Charleton is a daughter likewise. He had but the two children, and that by his first marriage. Respondent, Sophia M., is his second wife, by whom he had no children. The facts necessary to be noticed are, that his second wife had a fund given to her by the will of her father, to be held to her sole and separate use, subject to some limitations, which need not be here noticed. The fund so derived was to be loaned on good security, the interest to be collected annually and paid to Mrs. Churchwell if she desired, if not; the said interest to be reloaned as part of the principal. About 1849 George W. Churchwell was appointed trustee for this fund, on resignation of Dury P. Armstrong, and gave bond for faithful administration of his trust. This fund, in 1853, is shown to have amounted to upward of $13,000, all of which seems to have come into the hands of George W. Churchwell as trustee. Interest to the amount of $3,000, paid in negro property, is acknowledged to have been received by Mrs. Churchwell. The sureties of Churchwell becoming doubtful, one having died in 1856, he gave, under the direction of the Chancellor, a mortgage upon his home place, a tract of valuable land two miles from the city of Knoxville, containing nine hundred and

forty acres, as security for the trust fund. This deed
of trust or mortgage was given to Hugh L. McClung,
Clerk and Master of the Chancery Court, the fund
being under the control and administration of the
court. Its conditions were for the faithful manage-
ment of the fund, payment to the party or parties
entitled, and that the trustee would perform the de-
cree of the court pronounced from time to time. It
provided, however, that if by negligence or fraud, or
any unfaithfulness, any portion of said fund should be
lost, or the trustee fail in any of the duties imposed
on him, the trustee or his successor, under orders of
the court, should sell the land, and thus the proceeds
be appropriated to the security of the trust fund.

In this state of things it appears that George W.
Churchwell had become involved in a very heavy con-
tingent liability as endorser of certain notes in con-
nection with the Bank of East Tennessee, amounting
probably to a hundred or more thousand dollars. A
suit was pending seeking to enforce this liability. At
this time the land secured in the deed of trust, nine
hundred and forty acres, is estimated to have been
worth from thirty-five to fifty dollars per acre, and
was ample security for the fund. This was in the
early part of 1861. How the fund was invested does
not precisely appear—probably was loaned on securi-
ties then in the hands of the trustee, and amounted,
as shown by a report of the clerk and master, to
about $17,000, or a little over this sum.

Under these circumstances, in January, 1861, a bill
was filed in the name of the wife, service of process

acknowledged by Churchwell, simply asking an account of the trust fund, and a decree for the amount due, with enforcement of the deed of trust.    A short answer was put in by Churchwell acknowledging his liability to account, a report was made by the clerk showing the amount of the fund.    At the same term a decree was entered for the amount of over $17,000, the land ordered to be sold without redemption, Chuchwell in the meantime, in the same decree, is allowed to resign his trust, and Armstrong, a brother-in-law of Mrs. Churchwell, appointed in his stead, with authority to bid for the property, and buy it for the benefit of the trust.    Advertisement of the property is waived, and so the sale proceeded.    It was further ordered that if the property did not sell for enough to discharge the decree, an execution was to issue for the balance.    There is no suggestion of a breach of trust, or that the fund was not well secured, nor any ascertainment of the character of securities in which it was invested at the time.    In a few days after the bill was filed, by consent of parties, the above decree was entered, reciting the fact that Churchwell had been appointed trustee, the execution of the mortgage as security for the faithful management of the fund and payment thereof whenever required by the court, and now says the decree, in order that this court may see the condition of the fund, give proper directions for the management of said fund, the court ordered an account of the fund in his hands, or what should have come into his hands, with interest, with annual rests, all other ques-

tions being reserved till the report should be in. This report, made at same term, showed that up to October, 1853, there had been paid into the hands of Churchwell upward of $13,000, and that with interest up to the date of report, January 28, 1861, it amounted to $17,034.46. This report being unexcepted to, was confirmed, and thereupon a decree rendered in favor of the complainant, his wife, for this amount, for which an execution was ordered. It was then recited that the mortgage had been given, and bound Churchwell to faithfully manage the fund, and pay it whenever ordered by the court, therefore it was ordered and decreed by the court that the land be sold, after thirty days notice, to the highest bidder on six months credit, taking bond and security for the purchase money, a lien to be retained on the land, and on motion it was ordered the sale be without the equity of redemption.

It was then ordered that if the amount bid for said land should not be sufficient to pay the recovery, then an execution should issue against the property of said Churchwell. In addition, Churchwell resigned his trust, and by the same decree it was ordered that J. H. Armstrong, a brother-in-law of complainant, be appointed in his stead, who was authorized to buy the land, or any property that might be sold under the decree; the purchase, however to be subject to confirmation by the court at next term of the court. This land was sold and bid off by the trustee at $10,200, which left $7,254.63 balance, for which an execution was issued and levied upon what we take

to have been every article of personal property in possession of Churchwell, as we judge from the number and character of the articles shown in the levy. In addition a levy was made on a tract of land known as the Churchwell Ferry Farm, together with the ferry, the tract containing four hundred acres. Advertisement was waived, it seems, as to the land. The personal property was sold and bought by the trustee for a little over three hundred dollars. After crediting this, the ferry and land were sold, and likewise bought by the trustee at $7,214.74 cents, which, after deducting costs of sale, was applied to balance of the debt. These facts were reported to the court and confirmed, when it was ordered that the trustee should allow Churchwell to retain the possession of the personalty and use it, and to occupy and cultivate the farm under the supervision of the trustee; but Armstrong was ordered to rent the other tract of land and the ferry, and report to the court annually at the April term. It was then ordered and decreed that Churchwell should pay the costs, $119, for which an execution was directed to be issued. The reason for this execution seems to be found in the fact that there remained two more lots belonging to Churchwell in the city of Knoxville, and an execution was rendered to cover them, the case evidently being under the direction of friendly counsel. This was soon done, they were levied on and sold, and this last execution, with all costs, amounting to $125, bid on these lots by the trustee, and so the entire property of defendant was thus vested in the wife, or her trustee for

her benefit, to secure a fund of something over $17,000. This is the briefest summary we are able to make of the leading facts of the transaction sought to be impeached on the ground of incapacity of Churchwell, the party then affected by the decrees and proceedings, and because made under the controlling influence of his wife over a party alleged to have been unable to take care of himself, of unsound mind, and as charged the whole proceedings, therefore, null and void for this cause.

Before proceeding to a discussion of the main question, two preliminary questions require to be disposed of. It is insisted that on the statement of facts as contained in the original bill, it clearly appears that this was a fraudulent arrangement to defeat the expected recovery then being pressed by suit; and this being so, his administrator and heir are precluded by the fraudulent transaction of the intestate and ancestor from asking the aid of a court of equity to set the same aside in their behalf. The principle announced is a correct one, as has long been settled in our State, that a fraudulent conveyance is valid as between the vendor and vendee, and his heirs and distributees are bound by it. They are estopped by the act of their ancestor. The same principle would be applicable to a case like the present when the result is attained through the agency of decrees of a court. But the application of this well settled principle is avoided in this case on two grounds. First, the facts showing the pressure upon Churchwell are merely incidentally stated as part of the history of

the transaction, and the court is precluded from drawing the conclusion that a fraudulent arrangement to defeat the claims of creditors is charged in the bill, and so the complainants, as is claimed, estopped by the evidence of their pleadings, by the fact that it is evident that no such charge is intended to be made as ground for relief, and the further fact that in another aspect of the case it is relevant and proper matter to be considered on the question, whether the decrees were obtained from a party of weak mind, under pressure of circumstances calculated to make an impression on his mind that would lead him to yield to undue influence from those who were interested in procuring acts done by which they received benefit, and he and his estate detriment. The case of *Craddock* v. *Cabiness, et als.*, 1 Swan, 474, presents an illustration and application of the principle. In that case it was shown that one inducement to the conveyance to Cabiness and wife was, that Mrs. Craddock was made to believe she was liable as surety, or in some other way, to pay the debts of a son, and to avoid this in part, she made the conveyance sought to be set aside. The court say that it was clear such was the purpose, yet if advantage is taken of a party who is not positively insane, but of great weakness of mind, it is immaterial from what cause that weakness arises, whether from the infirmity of old age or those incidental depressions which result from sudden fear, or constitutional despondency, or overwhelming calamities, the relief should be granted. In this view the facts stated would be relevant and

appropriate to show the impending calamity threatened to fall on the party by the result of the suit referred to, and in connection with the charges of such weakness on the part of Churchwell, as is charged, may fairly be construed as referable to this question, and not to the one insisted on.

But a conclusive answer to this is found in the concluding allegations of the bill; which are, substantially, that Churchwell was at the time when appointed trustee, and at the time said proceedings were instituted and carried on, insane, and of such incapacity as to be unable to comprehend his act, or its results as well as under the controlling influence of his wife, and therefore the whole transaction was null and void. If this be true, whatever may have been the purpose of others, or the effect of what was done on the rights of creditors, he could not have been held responsible for the act, nor would the principle contended for work an estoppel, either upon himself or his heirs, when seeking relief against the proceeding.

The other question is, that a bill similar to this had been filed before the present one was prepared for hearing, and the case taken up and probably being heard, when complainants voluntarily dismissed the same, which was decreed by the Chancellor on their motion. It seems formerly in England this decree would have been final as *res adjudicata,* unless the bill had been dismissed without prejudice. But such has not been the rule in Tennessee. "It is only a decree on the merits," says this court in *Hurst* v. *Means,* 2 Sneed, 548, "that is a bar to a subsequent

suit." A decree dismissing a suit on motion and application of the complainants, is not such a judgment of the court as comes within the rule.

We now address ourselves to the main question in the case, was George W. Churchwell competent to act intelligently in the transactions which we have detailed? was his mind capable of understandingly, and with reasonable discretion, performing so important a series of acts as was required in the disposition of the estate to which we have referred? In a word, was he deranged, or at any rate of only such capacity as that while he might engage with some intelligence in small transactions, yet unfitted for comprehension of larger and more complicated ones? or was he not of such weak understanding, or in such a state of enfeeblement, both in body and mind, that he would be readily imposed on, or be the subject of an advantage easily had, and was such advantage taken of his weakness by those having influential control of him, as to render his acts void, as not being the free intelligent deed of an independent and competent mind? These are the questions to be solved in this case, and on which it turns. In deciding them, as a matter of course we can have no feeling either way as to the result, and must be guided solely by the testimony before us in the record. We have most carefully gone through with the immense mass of testimony in the case, and now give a short summary of its results. It would be too much to endeavor to present it in detail.

We find about this state of facts made out by a

large preponderance of the testimony. That previous to the early part of the year 1843, Mr. Churchwell was a most active, energetic, and aspiring lawyer; that he was fond of society, enjoyed popular applause, and had sought and held public positions of both honor and profit; that he had been noted for the energetic pursuit and practice of his profession; that he was eminently thrifty, and showed remarkable capacity for the accumulation of property, and had, by honorable means, accumulated a considerable fortune, and was still in the prime and vigor of his manhood, with every prospect of continued and still higher success, both in professional advancement as well as in adding to his fortune, as the result of his more matured powers, as well as increased experience. At this time, however, on a trip with his wife to Mobile and New Orleans, he had a severe attack of sickness, which is shown to have prostrated him physically, and deranged his mental powers so that while at New Orleans, and on his way home, he had to be the subject of the most watchful care, both from his devoted wife (for such she is shown to be) as well as an old family servant, who was his attendant on the trip. Facts are given in the proof illustrating his failure of discretion, such as his suddenly leaving the steamer at the wharf in New Orleans and purchasing a barrel, or perhaps a hogshead, of oranges, which his wife had great difficulty in getting clear of on the ground he was not competent to know what he was doing.

He was brought home in this state, and his family physician, Dr. Baker, who had been his trusted friend

for years, was called in, and he who had the best opportunities, together with the capacity, from professional knowledge, to judge of his state of mind, swears that he found him a total wreck of his former self, and that for a long time he was insane, presenting a case of violent form of the disease. Under skillful treatment the violent symptoms abated, and his physical strength was so far restored as that he was able again to go abroad, and in fact continued to do so up to a late period of his life, yet he says that up to 1858, when he ceased to be his family physician, he continued the wreck of his former self, and that the integrity of his mind was never restored. He and others intimately associated with the family, men of all professions, physicians, farmers, overseers, neighbors, his minister, all in fact, we believe, who had peculiar advantage for watching and observing him, especially at home, where his true character would best be seen, agree with remarkable unanimity in asserting their conviction, based on facts detailed, that he was insane from 1843 up to his death. They tell us, for instance, that from having acted before 1843 as a courteous and refined gentleman, that he became violent, fitful, irascible, and unreasonable to an extreme degree. That he would use the most violent and insulting language to his best friends, habitually calling them God-forsaken scoundrels, or hell-deserving scoundrels. That he became vulgar and obscene in language, even in the presence of strangers—a very usual result in such cases. That while he was and had been a member of the Methodist Church, and

was at times still most devout, he would frequently
end his devotions in his own family by rising from
his knees and abusing, even cursing, the servants.
That without any cause whatever he would abuse, and
even strike his best friends, or attempt to do them
greater violence, and then soon after weep like a
child for what he had thus done. This is a brief
summary of what is found in the large mass of the
testimony in this record. It is not stated as strongly
as the testimony would probably warrant on the side
of the complainant. In addition to this it is shown,
and of this there is no contradiction, that his wife,
the present defendant (who, by the way, is shown to
have been to him a true and faithful helpmeet in
affliction), had the most perfect and absolute control
over him. In the language of several witnesses who
had the most ample means to know, he obeyed her
as child would its mother. We state this at present
for the purpose of saying that this influence seems, in
all the relations of the two at home and abroad, to
have been used with most commendable forbearance
and prudence, yet it seems to indicate with much dis-
tinctness the enfeebled condition of the once proud,
ambitious, and self-reliant man, whose mental state is
now under investigation.

We have thus presented the salient features of the
proof on the part of complainants. It points to a
state of mind unmistakable. The picture, however,
must be slightly modified by an undertone, or sub-
sidiary view, to give the more accurate result, as is
generally the case in arriving at precision in all our

Mabry v. Churchwell.

judgments upon human character, as well as mental
manifestations.  It is true, no doubt, that all men
whose minds have any marked vitality in them live
what may be termed dual lives, the one as seen in
public, or when aroused, and presenting leading char-
acteristics in active manifestation; the other probably
quite the opposite apparently when such excitement or
exciting causes are removed.  The man as known to
the world, and accurately known too, is quite a dif-
ferent man to those who see and know him in the
privacy of home life, when all exciting conditions are
removed, he throws off his outer garments, so to speak,
and appears in a different *role;* yet to know the en-
tire man, he must be seen and known in both phases.
To these general observations Mr. Churchwell, though
deranged in mind, was no exception.  It is shown
that much of his time he was comparatively quiet;
that under such circumstances, which was probably the
general tenor of his life, when not subjected to ex-
citing conditions, he conversed with fair intelligence,
and understood what he was doing.  That under the
kindly forbearing attentions of his wife, and evidently
under her general direction, with probably other mem-
bers of the family or friends, he attended to and was
competent to attend to the ordinary business of life,
yet always showing the undertone of extreme liability
to excitement, which might any moment break out
into violence and folly.  His insanity is characterized
by physicians as emotional insanity, subjecting him to
be influenced by his surroundings to an abnormal ex-
tent, and so we may say that with no special cause

for excitement he presented the aspect of a man extremely irritable, and of an eccentricity of manner that was called strange, to say the least of it, by all brought in contact with him. It is further shown that while he was irritable and willful at times, and generally, yet he was easily influenced by flattery, and was, therefore, subject to be readily imposed on. As an instance of this, one witness tells us that he visited him in order to procure the right of way for a railroad over his land across the river from Knoxville; that at first he was met with the most emphatic, violent and, as he thought, unreasonable refusal. He persisted, however, and says he saw he had to attain his end by management, so he told him · that the purpose was to build a town on the land and name it Churchwell. Under this suggestion he very soon yielded, and gave the right of way desired. Several of the witnesses, who knew him well, say that while he attended to ordinary affairs, yet they felt sure they could have cheated him out of all he had at any time if they had chosen to take advantage of him. In conclusion of this summary we add, as a striking fact, that after his attack in 1843 he abandoned his practice, his public pursuits of every kind— ceased to accumulate or to trade, or to engage actively in any of the pursuits to which he had been so earnestly devoted before. This state of things, as given above, continued till his death, and certainly existed at the time of the proceedings sought to be set aside. In addition, we have the opinion of a number of most intelligent witnesses, that while he could, under

the advice of wife or friends, attend to small matters of business, such as settling his doctor's bills, making ordinary purchases at stores for his family, yet that he was totally incompetent to transact business of large importance, involving complication, requiring judgment and discretion. One merchant says that while he sold him freely articles necessary for his family, that he would not have sold him a large bill of goods because he did not deem him competent to decide intelligently upon such transactions.

On this rapid summary of the facts we have but to apply a few simple but well established principles of law, which we cite from an opinion of our own court, adopting the language of Mr. Justice Story, Eq. Jurisprudence, secs. 234, 235: "Contracts are utterly void (we would say are clearly voidable) when made by a person though not positively *non compos* or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition, or to resist importunity or undue influence, etc. For it has been well remarked, that although there is no direct proof that a man is *non compos* or delirious, yet if he is a man of weak understanding, and is harrassed and uneasy at the time, it cannot be supposed that he had a mind adequate to the business which he was about, and he might be very easily imposed upon." He adds that equity does not, however, measure the size of men's understandings, where the mind is sound, etc. In conclusion he says, a degree of weakness far below that which would justify a jury in pronouncing a verdict of lunacy coupled with other circumstances

to show that the weakness, such as it was, had been taken advantage of, will be sufficient to set aside any important deed.      These principles are well settled, and were adopted by this court in the case of *Craddock* v. *Cabiness, et als.*, 1 Swan, 482, 483.      The court lay down the principle clearly that under these rules that weakness only of capacity is of itself a most important ingredient in examining the question whether a bond or other contract has been obtained by fraud or undue influence, and shall be set aside for this cause.      But when coupled with other circumstances to show the weakness has been taken advantage of, in the language of Mr. Story, already cited, will be enough to set aside any important deed.

Applying these principles to this case, we are inevitably led to the conclusion that these transactions cannot be allowed to stand by any enlightened tribunal. We have the case of a man who was certainly laboring under a most definite *derangement* of his mental faculties, for all purposes of such a business, if not totally wanting in capacity, certainly of great weakness of mind.      We have such a party under threatened pressure of a debt incurred by endorsement large enough to sweep every thing he owned. We have a wife, who has absolute control over him.      Under these circumstances, under the thin guise of a legal proceeding, his large estate, worth from fifty to seventy-five thousand dollars, is, step by step, sold and purchased in pursuance of an arrangement (evidently dictated and guided by others) by the trustee of that wife, and thus the whole of his property secured to

her through the trustee.   This is all done to pay an assumed liability for $17,000 in his hands as trustee, which it had been his duty to loan on security, and which no doubt was so loaned, as it is evident he had no large monied transactions requiring the use of money after he was appointed trustee.   In fact he would not have been permitted by his wife and friends to have engaged in such transactions.   It is almost certain that if Mr. Churchwell had possessed the integrity of mind which characterized him as a lawyer before his misfortune, he would have known that this transaction would never have stood as against a creditor with a just claim.   In addition to this, he had but two children, daughters, the one the present complainant, the other the defendant, Mrs. Charleton, but they were daughters by another marriage.   By this transaction he excludes them, his only children, from any legal right ever to enjoy his estate.   Could any court hesitate, under the circumstances, to hold that such transaction could not stand, but must be set aside, and the property stand, as far as possible; as if the decrees and sales had never been made, and such must be the result in this case.

The result is, that a decree will be drawn in accordance with the result thus reached.   As to the personalty, consisting largely of household furniture, farming implements, etc., we do not think it proper to take any account of this, as it was probably of but little if any value at the death of Churchwell, and had been jointly used by husband and wife until then.

28

The widow will be entitled to dower in all the lands, both the mortgaged tract and ferry tract, and town lots. After this shall have been laid off, then an account will be taken of the rents and profits of the part of the real estate, exclusive of the decree including the ferry. As to the ferry tract of land and ferry, the account shall only be from and after the death of the husband, unless the rents and profits of the farm were accumulated in the hands of Armstrong, the trustee, up to the death of Churchwell, and then paid over to Mrs. Churchwell (which will be inquired into on taking the account), then she shall be held to account for such sum accruing before his death, but not otherwise. She shall only be charged with the rents and profits of the home tract from the death of the husband only, because they were both allowed by the decree of 1861 to possess and use said place, and did so jointly enjoy it till the death of Churchwell. The defendant will be allowed for permanent improvements so far as they have enhanced the value of the land, and will be also entitled to expenses incurred in keeping up and operating the ferry.

An account of the trust fund will be taken, showing the amount up to the time of the report, with interest, annual rents being allowed up to the death of Churchwell; after that time only simple interest on the amount then due. This change is made in former opinion because, on reflection, we see the trust ceased on the death of the husband, and the wife was entitled to the corpus of the fund, and not to the in-

terest annually on demand, and if not demanded, to be reloaned as principal. Our attention was not specially called to this in preparing the former opinion in this aspect of the matter. The rents of each year, in taking the account, will be set off against accumulated interest, and then the account be adjusted from the time the rents begin at the end of each year. Interest will be allowed on any surplus of rents from the end of the year.

It does not appear in what securities the fund was invested at the date of the decree. If desired, an inquiry may be had as to this, and if any of the corpus of said fund has been received by Mrs. Churchwell or her trustee from this source, the estate of Churchwell will be credited with this amount. If none, however, has been so received, then the whole fund will be chargeable to the estate. When this account is taken and balance ascertained, the home place not included in the dower, may be sold under the direction of the court to pay the same, and if not sufficient, then any other of the property, as may be ascertained to be most proper on inquiry by the court.

The case will be remanded to take proper accounts as directed, and for further proceedings. The costs of the court below and this court will be paid by Mrs. Churchwell up to the present time. The future costs as may be directed by the Chancellor.